v. United States, case number 24391. Good afternoon, your honors. Paul Skip Laser, CJA counsel for Tony Kelsey. Quote, I was going to stipulate to his competence unless something incredibly untoward happened, like talk about aliens and radio waves and such things that would make me doubt somebody's competence. Those words by trial counsel at the 2254 hearing, 2255 hearing, are the lens through which all the evidence in this case should be viewed. It explains counsel's acceptance of the Marquez report at face value. It explains trial counsel's... Why does it suggest accepting it at face value? Because... Why isn't it reflective of counsel's considered opinion after meeting with his client, reviewing the reports, and talking to prior counsel that this person is competent? Well, prior counsel is the one that asked for the competency hearing to begin with, the assessment, which ended up having him committed. There's no dispute about the record. Right. You're taking a quote that seems to be somewhat out of context or even vague and suggesting that it means that he just decided to be passive, and I guess I'm not seeing what is the basis for that. Because the behavior by Mr. Kelsey does not match counsel's idea of what incompetency is. You can be incompetent without being wildly delusional. You can be incompetent in many ways, which Dr. Zong, you know, explained. The things that Mr. Kelsey was saying had nothing to do with disagreeing with strategy, and it had nothing to do with, you know, aliens, but it very clearly showed that he was not understanding the seriousness of the charges against him. And it's these delusions and his inability to meet with counsel at all, which counsel knew, counsel knew very well his client was not meeting with him, was refusing to discuss anything. He was saying things like, I'm going to just beat this. I'm going to tell the court what's going on, and they're going to drop the charges. He was saying all kinds of things that indicate he didn't understand that he actually had a case. He was saying that he didn't have a case because he wasn't ever incarcerated in federal court, so there must not be a federal case. These are all indications of an inability to connect with the charges against him, which is what Dr. Zong found, regardless of whether he was bipolar. And so there were all these red flags, and then we get to the Marquez report itself, which says he failed miserably on the appreciation of his case, which matches what Dr. Zong was saying, which matches what counsel was seeing. But with an explanation, right? Well, an explanation about — Dr. Marquez explains why that score was what it was. I disagree, Your Honor. There was no explanation as to how the unwillingness that Marquez found did not mean that he was unable. Unable probably looked a lot like unwilling, but she just said he's unwilling, and that's all there is to it. With no treatment, there was a — you know, all the things that we found out in the Buettner records, there was no intervention whatsoever. And, you know, all of that is part of the prejudice of not investigating. But the point is, counsel knew what Dr. Zong was saying. Counsel's looking at his client. His client can't communicate with him. The report doesn't really say why Dr. Zong is wrong. It just said, well, we find that he's unwilling. Dr. Marquez, frankly, threw her hands up. And that's, I think, evident in the report itself. It's truly obvious when you look at the Buettner records. So delusional beliefs are not tinfoil hat stuff, and that's what counsel was viewing this as. And that's, I think, what the trial court — I mean, the district court sort of fell into also. District court, which, by the way, was not able to see counsel's interactions with his lawyer — I mean, with his client — is saying, well, he looks fine in court. Well, that's not the point. He was able to do lots of things. Well, it is a point, right? No, it's not. It's not even a relevant data point. How he performs in — how he acted in court is irrelevant. It is irrelevant. It is relevant because — We're supposed to consider the totality of the circumstances. No, no, no, no. Because the diagnosis of Dr. Zong was very specific. He said that you can be very normal in other ways, but if you're unable to meet with your client — I mean, with your lawyer, and you're unable to discuss your case because of your delusions, that aspect means that you cannot, you know, work with counsel. And so you can look okay in other ways. In fact, the marshal said that they would joke because they weren't talking about the case. It's only when he was talking about the case — and it was the same at Buechner. When he's talking about the case, he falls apart. He won't discuss it. He thinks it's not there. And that's the problem, is that — One would expect when he's in a courtroom that he might sort of recognize that this is about the case, no? Well, but he's not — during trial, he's not discussing the case. He's looking at the testimony. That's different from asking him what you think about the case, Mr. Kelsey. And he did, in fact, you know, outburst enough that the marshal had to set up a remote viewing in case they had to throw him out of the courtroom. I mean, he wasn't — he wasn't participating with counsel. That's the bottom line. Counsel's rationalizations at the hearing were that he didn't believe Dr. Zong. Okay, he said he didn't take that into account, but I don't know about that. He didn't consult with the family. And he didn't really discount the behavior that he was witnessing with his client. I think what happened was there was very little intervention going on at Beutner. Marquez wrote a report because it was the end of the four months. She knew that no interventions had happened. There was no reason to believe anything was different. In fact, Dr. Zong afterwards said he looks exactly the same to me as he did before he went to Beutner. So Marquez has to decide, well, I've got to send him back to court. So she writes this report, and she says unwilling instead of unable. Let me see. Sorry, Your Honor. What is the precise ineffectiveness that you want us to assign? In other words, here you have Dr. Zong and Dr. Marquez, and they come to different conclusions. But Dr. Marquez, of course, comes to her conclusion as encapsulated by this report with the knowledge of what Dr. Zong had reported and concluded. And you make different arguments about the records that counsel should have obtained, the underlying records and so on. But that's not exactly what I'm hearing here. I'm hearing that based on counsel's own review of what was happening in court, with his own eyes and ears and observations, and that he should have known that something was terribly wrong and that his client was incompetent or that he should have done more. What is the precise— It is this. Counsel's failure to make a reasonable decision that investigation was necessary. That's our bottom line.  So that's what I thought. I hadn't heard that. Yeah. So that investigation was necessary based on his observations of his client. And his observations with his client outside of court. Yes. And Dr. Zong's report and the cursory report of Marquez that didn't address Dr. Zong's issues and diagnosis. But when you say—let me just pick up on that last one. When you say it didn't address Dr. Zong's diagnosis, it acknowledges the diagnosis. It acknowledged the bipolar diagnosis. It did not acknowledge the delusions directly. She said that she thought he was just merely being unwilling and had a different version of the case. That was based on—and I understand that you minimize, I'd say, the extent of Dr. Marquez's interaction with Mr. Kelsey. I understand that. But that report was based on a couple of different interactions with him. Is that correct? Three, I believe, yes. Okay. How many times did Dr. Zong interact with him? Twice for probably 15 times longer of duration. All right. And how much time had elapsed between when Dr. Zong issued his report or conclusions? Four months. Four months. Was there any medication prescribed during that period at all? No. There was no intervention whatsoever. Why would—that was what Dr. Zong said at the 2255 hearing. Why would he be any better with no intervention, no treatment, no anything? And it's also the case—really my question is what are we to make of the fact that there was a, I think, three- or four-day evidentiary hearing that was conducted where the district court judge was also able to observe your client? And just to pick up—I'm open to your arguments, but to pick up on, I think, one of Judge Sullivan's questions, we are required under 2255 to consider the totality—to look at the totality, as was the district court judge. So what are we to make of the fact that there was a four-day evidentiary hearing after which the district court concluded— I've seen the testimony. I have seen and read the testimony—seen the testimony of Dr. Zong and testified. I've seen all these things, and I conclude that the government is satisfied its burden of demonstrating that Mr. Kelsey was competent. Well, there are a couple things. One, the court seemed to rely quite a bit on his own observations, and I believe that that was an error because the observations, as I said before, he was not in a position to make judgments about what counsel and client—what those interactions were, because he wasn't there. What's in court is different. It's a different universe. So he shouldn't have been relying on that. I should have been a little bit more precise because you're making an ineffective assistance of counsel claim, correct? Yes. That's your portal to get to the 2255, a disbelief, right? Correct?  Okay. So if a district court, after a four-day evidentiary hearing, determines that your client is competent to stand trial, then how do we consider that in connection with your claim that it was ineffective assistance of counsel to, among other things, not to obtain the records and so on and not to see that my client wasn't just not cooperative but incompetent? The judge has to be wrong in order for there to be ineffective assistance. I can see that. And that's why I was pointing out that the court's discounting Dr. Zong's testimony, relying too much on its own understanding of what Mr. Kelsey was acting like, that these were inappropriate ways to measure the prejudice of the failure to investigate. And so if the judge is wrong about the competency, then— Competency is a—on review, a matter for clear error review, correct? Yes. Okay. All right. So you have reserved some time for rebuttal, and this has been actually quite helpful. We'll hear from the governor. Judge Kubanis, can you hear us? Yes, indeed. Thank you. Great. Good afternoon, Your Honors. Nathan Gevermont for the United States. When Tony Kelsey's trial began in May of 2018, he was unwilling but not unable to understand the proceedings against him and assist in his defense. That was the conclusion of a forensic psychologist who evaluated Mr. Kelsey for four months. It was the conclusion of trial counsel who had reviewed that report and interacted with Mr. Kelsey. And it was the conclusion that Judge Hall reached both before trial and after a four-day evidentiary hearing on Kelsey's petition to vacate his sentence. This Court should affirm the denial of Kelsey's petition for the same reasons. Kelsey has not established that trial counsel was ineffective for declining to further investigate or challenge his competency, nor has he demonstrated any purported failure to investigate caused him prejudice. As Judge Hall properly— So what are we to make of the—Dr. Marquez's finding in the report that Mr. Kelsey's—her evaluation revealed, quote, clinically significant impairment of his appreciation of the seriousness of his case. We found this concerning and in need of further evaluation with also considering— while also considering limitations of this particular tool. That quote that you read is not a quote from Dr. Marquez's final report. That is a quote from the MacArthur assessment that was in the Buettner records. So that's part—well, that is part of the record— Oh, right. —that your friend on the other side says should have been obtained by counsel. And if he had obtained those records, then he might have had an argument either within the context of the evidentiary hearing or outside of it to persuade the district court that his client was incompetent. Certainly. So that quote could go to prejudice. It could not go to ineffective assistance in the first instance because that has to be measured without the effect of hindsight. We can all reevaluate decisions based on what would they have found had they investigated, but the preliminary question is whether the information that was available to them should have caused them to investigate. And I don't think that it would. But to address that specific quote, I think that what's more important is how Dr. Marquez articulated her conclusions with respect to the MacArthur assessment after having evaluated Mr. Kelsey for four months. And when she had evaluated him for four months, she rearticulated that conclusion to instead say that it was consistent not with a clinical impairment but with Kelsey's general disposition of refusing to engage with his case. And so the way that she articulated it after getting to know Mr. Kelsey and observing how he interacted with staff and speaking with him further, that is the conclusion that was available to trial counsel, and it was entirely reasonable for trial counsel to rely on that conclusion, given that it was consistent with their own experiences with Mr. Kelsey. And what else are we to make of the fact that, as I understand it, somewhere here, trial counsel actually admitted that if he had been aware of Dr. Zahn's prior disagreement as to competency, he would not have stipulated to his client's competency. I think that, again, would get to the prejudice question because I don't think that... Well, we're very focused, obviously, on prejudice. Yeah. So, I mean, what ended up happening is that there was a four-day infertility hearing where Judge Hall was able to hear testimony from Dr. Zahn and Dr. Marquez and other people who had observed the trial and both defense counsel to get a fuller picture of how Mr. Kelsey was comporting himself during the period of trial. And after all of that, Judge Hall concluded again that Mr. Kelsey was competent at the time of trial. And so the fact that Mr. Kosky would not have stipulated if there was a contravening expert, I think suggests that Mr. Kosky is a capable lawyer who could make a reasoned decision that if you have a person telling you that right now your client is incompetent, you should not stipulate to your client's competence. But what Mr. Kosky actually had before him was the report of Dr. Marquez, who observed Mr. Kelsey over four months at Buechner and had reached the conclusion that Mr. Kelsey was effectively unwilling to engage with his case, but he had the ability to engage if he chose to. I mean, it's a little troubling that you do have four months prior an evaluation that concludes that a defendant is incompetent to stand trial. And I take it you don't disagree that in the intervening four months prior to Dr. Marquez's evaluation, there's no medication, there's no known effort, at least on this record, to address the concern and the conclusion of Dr. Zhang. And you have then a sort of markedly different psychiatric conclusion about his competency. I certainly think the idea that a defendant could be tried who is incompetent is concerning, but I don't think that that is what occurred here, and so it's not concerning in this case. Dr. Marquez's report on its face explained the symptoms that Dr. Zhang was reviewing and explained why those symptoms were not consistent with a mental illness that was causing Mr. Kelsey to be incompetent. And so I think that Mr. Kosky did not have an obligation to pursue the question further. If there were any concern about Dr. Marquez versus Dr. Zhang, that question has been answered after a four-day evidentiary hearing where essentially it was a battle of the experts whose opinions better articulated the situation here, and Judge Hall concluded that essentially Dr. Marquez did, both based on Dr. Marquez's testimony, but also the intervening period of time further supported that Mr. Kelsey was not incompetent. Even Dr. Zhang acknowledged that if Mr. Kelsey had been incompetent with the particular mental illness that Dr. Zhang had diagnosed him with, he would not have lasted four years in BOP custody with no further incidents. He held a job, and he was not given any mental health treatment. He comported himself well at trial, and the record shows that over the next several years, he continued to show no symptoms of mental illness. And the reality is that if this mental illness was manifested exclusively with respect to Mr. Kelsey's views of his case, and not the factual circumstances of his case, because he was able to articulate the roles of everybody, the charges against him, he continued to assert that they were fake. That was the extent of his delusion, and that is not a delusion that Dr. Marquez concluded was the result of a mental illness that rendered him incompetent. It is the result of his own refusal to integrate information and to engage with counsel and understand the charges against him further, even though he had the ability to. It was a volitional failing, not a competency failing. All right. Well, if there are no further questions, I would ask the Court to affirm the judgment of the District Court. Judge Kabanos, do you have any questions? Fine. Thank you very much. Thank you. Counsel? Just a couple of things, Your Honor. First, evaluating for four months is an exaggeration. She probably met with him for between five and 15 minutes on a couple of occasions. How do I know that? Because there's no discussion in either the report or the records that explains what kind of interactions were there. So you're relying on the failure, but how do I know that what you say, that it was only five minutes, is correct? Because Dr. Marquez documented things, and she did not document anything more than he derailed immediately at the beginning of our and we got nowhere. How long could that have taken? There's nothing in the record that says it was five minutes, but it wasn't four hours. It's a pretty long report. Yes. And there's no discussion about the kinds of interactions that would have taken longer than a few minutes. You know, she said basically he went off the rails. That was the end of it. And the only two other ones, one was Mr. Kelsey flagged her down and asked how long is he going to be here, and the other one was, I forget what the third one was. But, again, it wasn't a protracted thing like, oh, the third one was the MacArthur, and we know what the results of that were. So her interactions with him apart from that were not good. She was listening to his phone calls, right?  She had reports of how he was doing at the facility. Which was not good. Well, I mean, it was not good in the sense that, well, I mean, it was consistent with Dr. Zong's finding, though, right? It was consistent. He was being delusional with his family, and she discounted that. Whenever he was talking about the case, he was being delusional. How can someone who says the case — But I think that's the point. If you're just being unrealistic, which you're describing as delusional about your case, but not in any other area, that would support Dr. Marquez's finding that this is not a person who's suffering from delusions. No. You're disagreeing, obviously, where the district court came out. But the district court heard the testimony over multiple days, right? She didn't say he was not delusional. She said he was not bipolar. But he was delusional. What she was saying was, you know, I'm saying that these delusions are simply unwillingness. But if you think your case is fake because you weren't incarcerated in a federal court, how are you going to participate with your defense? That's the focus of this, is participating in your defense. Not can you sit through court for four hours and be undisruptive. Not can you have a conversation about sports with the marshal. It's whether you can participate in your defense with your counsel. And there is nowhere in anything that we've seen that indicates that he could do so. Marquez simply said, well, I think it's unwilling, not unable. But she didn't say how it was not unable. She just differently characterized his interactions. How would one say how he was not unable? If there had been some interactions with the people who were supposed to be treating him, if there had been some kind of intervention, if there had been an assessment, which she never did, and she said in the hearing, I didn't do an assessment of his ability because I already knew he was unwilling. That's a non-answer. And that's the whole issue here is she just said unwilling and never discounted the possibility that the unwillingness was due to being unable. And if you're unable to meet with your client about his case, then you can't use him to participate. And that's the bottom line here. I think I've run out of time. Thank you very much. We'll reserve the session.